## PORTIONS OF THE VALENTINE ANTI-TRUST LAW UNCONSTITUTIONAL.

[Circuit Court of Delaware County.]

### PEARLY W. GAGE v. THE STATE OF OHIO.

Decided, July 30, 1903.

*The Valentine Anti-Trust Law* (93 O. L., 143)—*Construction of—Constitutionality of—Criminal Provisions of—Sufficiency of Indictment Under—Effect of Plea of Guilty to an Insufficient Indictment —Sections* 4, 5, 6 *and* 7 *Unconstitutional.*

1. An indictment under the act of April 19th, 1898 (93 O. L., 143), charging that the accused, between two given dates, "was an active member of, acted with and in pursuance of, aided and assisted in carrying out the purposes of the Delaware Coal Exchange, an association of persons organized for the purpose of preventing competition in the sale, and to maintain a uniform and graduated figure for the sale of coal, and to directly preclude a free and unrestricted competition among the members of said association, purchasers, and consumers in the sale and transportation of coal," does not contain facts sufficient to constitute an offense against the laws of the state of Ohio.

2. Sections 4, 5, 6 and 7 of said act are in violation of the Constitution of the State of Ohio, and of the Constitution of the United States, for the reason they create criminal offenses, prescribe proceedings thereunder, and provide penalties for the violation of any of the provisions of Section 1 of said act, by all combinations of capital, skill, or acts by two or more persons, firms, partnerships, corporations, or associations of persons, without regard to whether such combinations deprive individuals or the public of any legal right.

3. A plea of guilty to an indictment which does not contain facts sufficient to constitute a crime, will not prevent a prosecution in error by the accused to have such judgment reversed.

VOORHEES, J.; McCARTY, J., and WINCH, J., concur (the latter sitting in place of Judge Donahue).

Error to the Court of Common Pleas, Delaware County, Ohio.

Plaintiff in error was indicted under the act of April 19th, 1898 (93 O. L., 143), known as the Valentine Anti-trust Law.

To this indictment he demurred upon the grounds, first, that the facts therein stated do not constitute an offense against the laws of the state of Ohio; and, second, that the statutes under which said indictment was presented and returned are in violation of the Constitution of the State of Ohio, and of the Constitution of the United States.

The demurrer was overruled and plaintiff in error excepted. He then pleaded guilty to the indictment and filed his motion in arrest of judgment upon the same grounds stated in his demurrer. This motion was overruled and exceptions taken thereto. Plaintiff in error was then sentenced, to which he also excepted, as fully appears upon the record. Error is prosecuted to this court on the ground that the lower court erred in overruling the demurrer and motion in arrest of judgment.

The indictment charges that "on the first day of November, 1902, with force and arms, in said county of Delaware, and state of Ohio, and until this sixth day of January, 1903, said Pearly W. Gage, late of said county of Delaware, was an active member of, acted with and in pursuance of, aided and assisted in carrying out the purposes of the Delaware Coal Exchange, an association of persons organized for the purpose of preventing competition in the sale, and to maintain a uniform and graduated figure for the sale of coal, and to directly preclude a free and unrestricted competition among the members of said association, purchasers and consumers in the sale and transportation of coal, contrary to the form of the statute in such case made and provided," etc.

Testing the sufficiency of the indictment in this case on demurrer, it will aid materially to notice some facts that are not alleged or charged.

It is not alleged that plaintiff in error, or the association to which it is alleged he belonged, was engaged in the sale or transportation of coal; or that he, or said association, was in a position to influence or affect the price of coal to consumers, or that they attempted to do so. It is not alleged that the members of the association were not themselves the purchasers and consumers mentioned therein, and that they were not simply seeking to protect their own rights and interests in the purchase and transportation of coal.

It is not alleged that the association mentioned was not a partnership of which the plaintiff in error was a member, or that whatever agreement may have been made between them was not made between themselves as partners in the usual and ordinary methods in which partnerships are formed and their business carried on.

It is not alleged that whatever agreement was made to prevent competition was not made in connection with the sale of the business of the individual members to the association, or for the purpose of protecting the good will of such business.

It is not alleged that the association was formed solely for the purpose of preventing competition, or that that was its principal or primary object or purpose.

These facts not being alleged in the indictment, the indictment must stand on the facts stated, let the facts which are not stated be as they may; and facts not stated are, therefore, to be assumed most strongly in favor of the accused and against the State, in determining the sufficiency of the indictment on demurrer.

We must consider the facts that are alleged in the indictment, regardless of those not alleged.

If the indictment is good, it is because any agreement between two or more persons, one of the purposes of which is to prevent any competition, constitutes a criminal offense under this act, without any regard to the relationship of the parties, or the circumstances under which it is made, or whether it does or does not injuriously affect the public or other individuals.

Literally construed, the statute makes it criminal for two or more persons, firms, partnerships, etc., to make or carry out any contract, obligation, or agreement, by which they combine or agree not to sell any article below a standard or common figure; to fix values and to keep the price of such articles at a fixed or graduated figure; to settle the price of any article between themselves, or between themselves and others; to exclude all free and unrestricted competition among themselves, or among themselves and others, either in selling to or purchasing from others.

An agreement between two or more persons forms a combination between them. By this act an agreement between two persons is made as criminal as an agreement between many persons without limit as to number. It is made criminal for two or more persons

to combine as partners, corporators, or otherwise, in ordinary business affairs to increase or reduce the price of commodities, or fix the standard thereof. It is made criminal for two or more persons to agree to limit or reduce the production of commodities, or to limit competition, or to make any agreement in relation to the price of an article, so as to preclude free and unrestricted competition between themselves, or between themselves and others. It is made criminal for two or more persons to create or carry out any restrictions in trade.

Under the literal reading of the statute all such agreements are made criminal, regardless as to whether such agreements work or cause injury to persons, or the public. In other words, it is made criminal for two or more persons to directly or indirectly unite their interests, connected with the sale or transportation of any commodity, whereby its price may in any manner be affected.

The statute would cover and make criminal a contract for the protection of the sale of the good-will of an established business, or that would unite any interests which might in any manner affect the price of their commodities.

The common law does not condemn all restrictions in trade, or all agreements to prevent competition, as illegal or contrary to public policy. Our Supreme Court, in the case of *Lufkin Rule Co.* v. *Fringeli et al,* 57 O. St., 596, held:

"All agreements in general restraint of trade are against public policy and void; but agreements having such partial effect only, made in connection with the purchase of a business and its good-will, shown to be reasonably necessary to the enjoyment of the good-will of the business purchased, and not oppressive, may be enforced."

Under our system of government, with its constitutional provisions everywhere in force, neither the legislative nor the executive department thereof can fix the price at which any merchandise shall be sold for private use or consumption. To do so would be a taking of private property for private use. Private property can be taken for public use on making just compensation; but it can not be taken for private use on any terms.

It is hardly necessary to cite authorities on this proposition;

however, a leading New York case, *Taylor* v. *Porter,* 4 Hill, 140, 143, may be mentioned.

The right to combine, form partnerships and joint stock associations, and to agree as to prices and productions, to raise and lower prices, as the necessities of the times and conditions of business may require, are not against public policy, nor unjust to the individual. This is an essential right, as part of the liberty of the citizen, of which no Legislature can deprive him.

Every crime involves, at least in its final consummation, the violation of some legal right, of some individual, or class of individuals, or the public. Some crimes, such as conspiracy, consists only in the initial stage of a violation of a legal right, which has not gone so far as an overt act. But no act constitutes a crime in its initial stage, unless that act, in its final consummation, constitutes a violation of some legal right of some individual, or class of individuals, or the public. This principle is also fundamental. 4 Blackstone's Com., p. 5.

Applying this principle to the statute under consideration, no agreement or combination of individuals can constitute a crime, unless the act complained of, when consummated, will deprive some individual, or class of individuals, of some legal right. In other words, there can be no legal injury to the public, unless there be a legal injury to some individual, or class of individuals, from the act which is the object of the agreement or combination.

The fault of the act under consideration is that it is too general. It makes no distinction between legal and illegal combinations and agreements which prevent competition, or are in restraint of trade. Contracts which have always been embraced in those inalienable rights essential to the liberty of the citizen are made criminal equally with those which the law has always condemned. Statutes prohibiting all contracts or agreements which prevent competition under all circumstances are infringements of the constitutional liberty of the citizen. All contracts which are in restraint of trade, or prevent competition, are not illegal. *Lufkin Rule Co.* v. *Fringeli et al, supra.*

In the case of *Leslie* v. *Lollard,* 110 N. Y., 519, the court say:

"Competition is not always a public benefaction, for it may be carried on to such a degree as to be an evil. It is perfectly legiti-

mate to combine capital for all the mere purposes of trade for which capital may, apart from combination, be legitimately used in trade."

If this right to combine exists, then the right to do ordinary business, such as fixing prices, changing prices, and to reasonably agree on production, etc., must of necessity follow; and all these things are only consonant with the constitutional liberty of the citizen.

This act of the Legislature does not stop at reasonable limits; it is not content with making general restraint of trade, but it makes criminal all restraint of trade. It not only affixes penalties to acts or contracts which unreasonably restrict competition, but it condemns as criminal any agreement or arrangement which prevents competition between two or more persons entering into it. It not only prevents competitors from oppressing the public by unreasonable agreements as to production and prices, it also prevents persons associated in interest, joint owners and co-partners, from making any agreement about their production and prices. It not only prevents persons from using their capital, skill, and acts for the purpose of increasing prices, but for reducing prices as well. This destroys the reason of the enactment, and consequently the act is self-destructive.

The act in thus preventing and making it a penal offense for citizens of the United States to make valid contracts with respect to their business and property, and depriving them of the right of their property as well as liberty, is a violation of the Fourteenth Amendment to the Constitution of the United States.

That portion of the Fourteenth Amendment referred to is the latter part of Section 1, and is as follows:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property without due process of law, or deny to any person, within its jurisdiction, the equal protection of the laws."

The Constitution declares:

"This Constitution, and laws of the United States which shall be passed in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall

be the supreme law of the land, and judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

In the case of *Dent* v. *West Virginia*, 129 U. S., 124, the court, in speaking of due process of law and equality of citizens, said:

"The great purpose of the requirement is to exclude everything that is arbitrary or capricious in legislation affecting the rights of the citizen."

In the case of *Live Stock Dealers & Butchers' Ass'n* v. *Crescent City Live Stock Landing & Slaughtering Co.*, 1 Abb. (U. S.), 399, the court said:

"No proposition is more firmly settled than that it is one of the fundamental rights and privileges of every American citizen to adopt and follow such lawful and industrious pursuits, not injurious to the community, as he may see fit, without unreasonable regulation or molestation. There is no more sacred right to citizenship than the right to pursue any legal employment in a lawful manner. It is nothing more nor less than the sacred right of labor."

Does it not necessarily follow that these constitutional privileges which protect the citizen in his life, liberty and property, secure to him the right to raise, produce and manufacture articles of general use; to buy and sell; to fix and limit the amount of any article which he will produce or manufacture; to increase or reduce the amount so produced or manufactured at his own will, within the limits of his ability; to fix and limit the price at which he will buy and sell; to bargain and agree with others upon prices, so far as it may be necessary in the business of buying and selling; in fact, to do anything and enter into all contracts usual and necessary in the ordinary avocation of production, manufacture and trade? Neither the state nor the National Legislature possesses any right to limit these natural privileges of contracting or conducting business. Any law which undertakes to abolish these rights, the exercise of which does not involve infringement upon the rights of others, or to limit the exercise thereof beyond what is necessary to provide for the public welfare and general security, can not be included in the police power of the government. Liberty in its broadest sense, as understood in this country, means

the right not only of freedom from servitude, imprisonment or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue any lawful trade or avocation.

The principles hereinbefore stated are supported by the following authorities: *People* v. *Marx,* 99 N. Y., 377; *Berthalf* v. *O'Rully,* 74 N. Y., 515; *People* v. *Gillson,* 109 N. Y., 389; *Toledo W. & W. Ry. Co.* v. *City of Jacksonville,* 67 Ill., 37; Tiedeman on Limitation of Police Powers, 233; *Registering Co.* v. *Sampson,* L. R., 19 Eq., 462; *Diamond Match Co.* v. *Roeber,* 106 N. Y., 473; *United States Chemical Co.* v. *Provident Chemical Co.,* 64 Fed. Rep., 946; *In re Grice,* 79 Fed. Rep., 627.

The title of the act makes no distinction between oppressive and unreasonable combinations and those contracts and agreements made between two or more individuals, which have always been recognized and sustained at common law. There is no limitation in its sweeping provisions, or its consequences, in making criminal any violation of its terms. It embraces all contracts, such as sale of good-will not to engage in the same business; contracts between partners not to engage in a rival business, etc.

The Legislature can not, under the pretense of exercising the police power, or under any other claim or pretense, enact laws prohibiting harmless acts not concerning the health, safety or welfare of society, and the courts may examine into and annul such illegal legislation. *Toledo W. & W. Ry. Co.* v. *City of Jacksonville,* 67 Ill., 37; Tiedeman on Limitation of Police Powers, page 244.

The inalienable right of enjoying liberty and acquiring property, guaranteed by the first section of the Bill of Rights of the Constitution, embraces the right to be free in the enjoyment of our faculties, subject only to such restraints as are necessary for the common welfare.

Liberty to acquire property by contract, can be restrained by the General Assembly only so far as such restraint is for the common welfare and equal protection and benefit of the people, and such restraining statute must be of such a character that a court may see that it is for such general welfare, protection and benefit. The judgment of the General Assembly in such cases is not conclusive. *Palmer et al* v. *Tingle,* 55 O. St., 423.

And in *State, ex rel,* v. *Buckeye Pipe Line Co.,* 61 O. S., 520, the court, in speaking with reference to the police power of the state, on page 548 say:

"In all considerate discussions of the subject, it is conceded that in the exercise of this power the Legislature can prohibit only those uses of property which are hurtful to the public, and the inhibited use must be hurtful in a legal sense."

In view of these principles how should courts interpret statutes which make it an indictable offense for persons to combine to do acts injurious to trade or commerce?

We think that they should follow the common law and that line of authorities which holds with unvarying tenor that the essence of a crime is an injury, that is, the violation of some legal right, and which holds, especially as to the crime of conspiracy, that an agreement or combination to be criminal must contemplate the doing of some act that is unlawful, either as means or end; and, that the correct legal interpretation of the phrase, "an act injurious to trade or commerce," is that it is an act which violates some legal right in connection with trade or commerce.

The Supreme Court in the case of *The State, ex rel Monnett,* v. *The Buckeye Pipe Line Co., supra,* while having under consideration the act of the Legislature here in question, limited its holding strictly to cases then before the court, and did not undertake to decide whether the criminal provisions of the act were or were not constitutional.

The court, by Shauck, C. J., on page 547 say:

"We are, therefore, to consider only those provisions of the act which are relevant to the cases before us. These cases are civil actions brought against independent corporations. The contract which we are asked to denounce is not incidental to the sale of property or any interest therein. It does not concern the good-will of any business. It does not contemplate the formation of any corporation or other company for the carrying on of any business. In the subject of the contract the interests of the contracting parties are not adverse; they are not even diverse. The agreement, according to the allegations of the petition, has no purpose whatever except to prevent competition in the production, transportation and refining of petroleum, to the end that there may be received from the consumers of its products higher prices than would prevail under the condition of open competition."

It is quite familiar doctrine that in determining the constitutional validity of statutes their different provisions are not necessarily subject to the same conclusion. Therefore, we are not concluded by this decision of our Supreme Court, so far as the question of the constitutionality of the criminal provisions of the act is concerned.

The question arises, whether the different criminal provisions of the act are separable, so that a part may be held unconstitutional without affecting the validity of the remaining criminal provisions of the act? We think not. The rule that part of an act may fail and the remainder stand has very strict limitations when applied to penal acts.

The criminal provisions of this statute are so interdependent that they can not be separated except by judicial construction. This can not be done. *U. S.* v. *Reese,* 92 U. S., 214-221; *Baldwin* v. *Franks,* 120 U. S., 678.

To give effect to the rule permitting a separation of the different parts of a statute, that which is constitutional and that which is unconstitutional must be capable of separation so that each may be read by itself. *Baldwin* v. *Franks, supra.*

In *U. S.* v. *Reese,* Waite, C. J., uses this language which is pertinent in the construction of the statute under consideration:

"It would certainly be dangerous if the Legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government."

We therefore hold that the act under which the indictment was found is unconstitutional and void so far as it creates criminal offenses, prescribes proceedings thereunder and provides penalties for its violation.

2. Aside from the constitutionality of this act the demurrer raises the further question as to the sufficiency of the facts stated in the indictment to charge an offense against the laws of the state of Ohio.

When we consider the facts alleged, as well as those not alleged, in the indictment, it would be entirely consistent with the allega-

tions of the indictment to assume that the association or combination complained of, of which plaintiff in error is alleged to be a member, may have had other purposes than that of preventing competition in the sale of coal, or to maintain a uniform and graduated figure for the sale of coal, or to directly preclude a free and unrestricted competition among its members, purchasers and consumers in the sale and transportation of coal. There is an entire absence of any allegation of conspiracy to do any of the acts complained of, and of the committing of any overt act in furtherance of any scheme whereby the association, or any member thereof, received or might receive higher prices than would have been received under conditions of an open competition.

An indictment which only charges that the plaintiff in error was an active member of, acted with and in pursuance of, aided and assisted in carrying out the purposes of said coal exchange, an association of persons organized for the purpose of preventing competition in the sale, and to maintain a uniform and graduated figure for the sale of coal, and to directly preclude a free and unrestricted competition among the members of said association, purchasers and consumers in the sale and transportation of coal, without allegation of some overt act committed in furtherance of the alleged purposes of said association, whereby some legal right of some individual, or class of individuals, or the public, is violated, is not sufficient under the laws of this state.

The Constitution of Ohio, Article I, Section 10, provides that "In any trial in any court, the party accused shall be allowed * * * to demand the nature and cause of the accusation against him, and to have a copy thereof, to meet the witnesses face to face." Trial in any other manner would not only violate this provision, but would not be "due process of law."

The purposes of an indictment and the certainty of statement required therein, are fully stated in *Fouts* v. *State,* 8 O. S., 98, 114, in which the court said:

"If any one or more of the substantial ingredients or distinguishing constituents of the crime may be omitted, the written accusation required would become a mere snare by which to mislead and entrap the accused on his trial."

Section 5 of the act under consideration attempts to make an accusation sufficient which omits every specific statement which

would tend to give the accused a knowledge of the nature and cause of the accusation against him. The section provides that it is sufficient to state that the accused is a member of, acted with or in pursuance of, or aided or assisted in carrying out the purposes of a trust or combination, without giving its name or description, or how, when and where it was created. Everything which would identify the trust or combination may be omitted from the indictment with the consequence that the accused can have no knowledge of what he is to defend against.

If any agreement can be made which restrains trade or prevents competition without being a crime under the provisions of this act, the provisions of Section 5, which prescribe what the indictment may contain, are too uncertain because of the generality of its terms. The indictment should allege the particular acts complained of, which distinguish the agreement or combination as criminal from those which are not criminal, and it is not within the power of the Legislature to dispense with these essential requisites of an indictment.

We, therefore, hold that the facts stated in the indictment do not constitute an offense against the laws of the State of Ohio.

3. Did the plaintiff in error, by his plea of guilty, waive the right to object to the defects raised by his demurrer to the indictment? We think not.

A plea of guilty to an indictment which does not contain facts sufficient to constitute a crime, will not prevent a prosecution in error by the accused to have such judgment reversed. *Hogue* v. *State,* 23 Cir. Ct., 567, 569; *Davis* v. *State,* 19 O. S., 270; *Carper* v. *State,* 27 O. St., 572, 575.

Our conclusion is that the demurrer to the indictment is well taken on both grounds and should have been sustained, and the court of common pleas erred in overruling the same, and in overruling the motion in arrest of judgment. For these reasons the judgment is reversed with costs.

*George W. Carpenter,* of Columbus, and *H. W. Jewell,* of Delaware, for plaintiff in error.

*Edward T. Humes,* Prosecuting Attorney, and *E. M. Wickham,* of Delaware, for defendant in error.